ROSE J. BANTON vs. WILSON CROSBY, and others.

Penobscot.    Opinion July 26, 1901.

*Revolutionary Soldiers' Lands.    Resolve.    Deed.    Heirs and Assigns.    Mass.
Resolves, Mar. 5, 1801; June 19, 1801; Feby. 19, 1813;
June 17, 1820; Mar. 4, 1828.*

1.  A legislative resolve, " that there be and hereby is granted to each [revolutionary] soldier etc., two hundred acres of land " in a particular township is a grant in praesenti, though the fact that the claimant thereunder was such a soldier was to be afterward proved, and the particular lot of land was to be afterward located.

2.  A subsequent deed under authority of such resolve from the land agent to " the heirs and assigns " of Jonathan Bartlett whose claims as a revolutionary soldier had then been established, does not create the title, but merely identifies the beneficiary and the land, and confirms the title granted by the resolve.

3.  A deed from the heirs of Jonathan Bartlett of all their interest in the lands granted by the resolve given after the claim of Bartlett had been presented, but before the deed from the land agent, passed their interest and the land agent's deed inured to the benefit of the grantees.

See *Millett* v. *Mullen*, ante, p. 400.

On report.    Judgment for plaintiff.

Real action against Wilson Crosby and others, devisees of William C. Crosby, deceased, and Clara W. Gibson and others, devisees of Thomas N. Egery, deceased, to recover lot 29, Township 2, range 7, West from the East line of the State, Penobscot county, and containing 200 acres.

*C. A. and T. D. Bailey; and M. Laughlin,* for plaintiff.

Plaintiffs' predecessors in title bring themselves within the provisions of the resolve of March 5, 1801, and the State issued a certificate to the heirs of Jonathan Bartlett and afterwards a deed. *Cary* v. *Whitney*, 48 Maine, 527; *Sargent* v. *Sampson*, 8 Maine, 148; *Mayo* v. *Libbey*, 12 Mass. 339; *St. Joseph & D. C. R. R. Co.* v. *Baldwin*, 103 U. S. 427; *Southern Pac. R. R. Co.* v. *Poole*, 32 Fed. Rep. 451; *U. S.* v. *Brooks*, 10 How. (U. S.) 422; *Lessieur* v. *Price*, 12 How. (U. S.) 59; *Shulenberger* v. *Harriman*,

21 Wall. 44; *Johnson* v. *McIntosh*, 8 Wheat. 681; *Mitchell* v. *Peters*, 9 Peters, 711; *Mann* v. *Wilson*, 23 How. 457. The resolve of February 28, 1828, released the soldiers, their heirs or assigns from their settling duties, and confirms them in their title. We have a construction of this very resolve in *Chandler* v. *Wilson*, 77 Maine, 76. In that case PETERS, C. J., nowhere says that the resolve did not vest a fee in some one. The question at issue was not whether this resolve vested a fee, but in whom it vested. He held that it did not vest or confirm title in the old soldier exclusively, but, if the soldier had assigned his claim previous to the passage of the resolve, it vested in the assigns. The old soldier or his heirs had from 1801 to 1828 in which to convey their claims or certificates to land if they saw fit, and the resolve of 1828 vested the fee absolutely in whomsoever was entitled to receive it at the date of its passage. It must necessarily confirm a fee in some one, —the old soldier if alive, to his children or heirs if he is dead, or in his assignees if he had assigned his claim. There were so many applicants entitled to land that all the lots in Mars Hill Township were drawn and more land was needed; so on February 28, 1829, a resolve was passed appropriating two more townships, 2 R. 7, W. E. L. S. and 2 R. 4, N. B. K. P. A deed from the land agent was not necessary, any manner of notifying the owner of the floating 200 acres that his land had been located would have been sufficient. The certificate of the lot drawn or assigned was just as effectual as a deed. The Commonwealth had made a floating grant of two hundred acres by a resolve which contained no provision for a deed. In order that the beneficiaries of the resolves, their heirs or assigns, might know when their land was located, the land agent made a deed. Even if these resolves of 1801 and 1828 did not pass a fee, yet the demandant is entitled to recover because Osmyn Baker, from whom she claims title, had title if we look at another phase of the case. On August 10, 1835, Samuel Bartlett and Caleb Hubbard conveyed lot 29 to Osmyn Baker by warranty deed. On February 10, 1830, the Commonwealth conveyed this lot twenty-nine to the heirs of Jonathan Bartlett. The deed from the heirs of Jonathan Bartlett to their brother Samuel

Bartlett was dated April 10, 1828, but not acknowledged until August 10, 1838. The court will uphold deeds if they can rather than render them nugatory, according to the maxim ut res magis valeat quam pereat. *Loomis* v. *Pingree*, 43 Maine, 308. *Poor* v. *Larrabee*, 58 Maine, 543–561.

*M. Laughlin*, for plaintiff also argued.

The time of redemption has not yet expired under the plain provision of ch. 65 of Public Laws of 1848. Under it time begins to run only by taking the advertisement as a starting point; not from any act of the legislature as in ch. 14 of R. S., of 1841. The legislature assumed that there would be a proper advertisement. So that if an advertisement in strict compliance with the act of 1848, ch. 65, is not shown, then redemption is still open, and there has been no forfeiture to the state. There is no evidence of the advertisement. *Hodgdon* v. *Burleigh*, 4 Fed. Rep. 111, 122–3. The case is wholly barren of evidence to show a single step by either the treasurer or the land agent in an attempted compliance with provisions of § 3 and § 4 of ch. 65 of Public Laws of 1848. *Tolman* v. *Hobbs*, 68 Maine, 316.

The attempted conveyance being of a certain number of acres out of a larger number, no parol evidence is admissible to show what particular acres passed, or were intended to pass, by the deed. 1 Jones R. P. on Conveyancing, § 337; *Hodgdon* v. *Burleigh*, 4 Fed. Rep. 111; *Green* v. *Alden*, 92 Maine, 177; *Moulton* v. *Egery*, 75 Maine, 485; *Skowhegan Sav. Bank* v. *Parsons*, 86 Maine, 514; *Smith* v. *Furbish*, (N. H.) 47 L. R. A. pp. 233–4. Official and unofficial deeds: *Simpson* v. *Blaisdell*, 85 Maine, 199; *Ball* v. *Busch*, 64 Mich. 336.

*Chandler* v. *Wilson*, 77 Maine, 76, overrules *Hodgdon* v. *Wight*, 36 Maine, 326, although not referring to it. And see *Van Wyck* v. *Knevals*, 106 U. S. 368; *Putnam* v. *Farrington*, 90 Maine, 405, as to the State taking advantage of a forfeiture. If the owners of the land at the time of the passage of the act of 1852, ch. 272, had title by reason of defects in the tax proceedings, then the act attempting to divest the owners of their title and vest it in defendants, was unconstitutional and void. *Hodgdon* v. *Burleigh*, supra.

That act was intended to cure only defects in the attempted trans-
fer from the state to the purchaser; the act expressly providing
that only the interest of the state should pass; therefore, if the
state had no interest, there was no attempt to cure anything; and
its provisions that "irregularities in the notices or failure to comply
with the provisions of the acts under which the sales were made"
are strictly limited to defects in procedure for sale, and do not
apply at all to defects in assessment or to any defect prior to
attempted sale.

*F. H. Appleton and H. R. Chaplin*, for defendants.

Although the title to only one lot of land of 200 acres is involved,
the effect of the decision of this court in this case is sure to be far
reaching, and of great importance, because this action, together
with other actions involving the same principle to be argued to this
court, is, in our opinion, an important step in a carefully conceived,
deliberate and bold attempt to acquire the title to many thousands
of acres of land in this State, and for a nominal sum.  Outline of
the history of this town :  When Maine became a state this town
was, by the commissioners duly appointed for that purpose, set off
to Mass. which in 1829 caused the town to be lotted by one Kel-
sey, and his plan of that lotting is known as "Kelsey's Plan."
Massachusetts by various resolves provided for the giving of the
various lots to Revolutionary soldiers and by deed dated February
10, 1830, recorded February 11, 1840, conveyed this lot 29 to the
heirs and assigns of one Jonathan Bartlett.  From that time until
June 10, 1898, nothing was done with that title.  On June 10, 1898,
Elizabeth O. Baker executed a deed of this lot for one dollar as
shown by the deed to Herbert J. Banton the husband of the plain-
tiff.  On August 31st, 1898, Banton executed a deed to his wife,
which included this lot 29, and seven other lots in this town.
Under the agreement of separation between Mass. and Maine, so
long as the title to any land in Maine remained in Mass. such land
was not taxable by Maine.  After Mass. had parted with the title
to any of its lands in Maine, such land then became taxable by
Maine.  Massachusetts did part with the title to this lot, in 1830,
and, therefore, thereafter Maine could legally tax it.  Maine did

tax the whole town in which this lot was situated; but the taxes
of 1844 and 1846, will only be considered, because we were unable
to find, after a most thorough search, the state papers for any other
years.   The defendants claim that for the non-payment of the
taxes of those years, this lot became and was forfeited to the state,
and the state thereafter sold this and other lots in this town to
Amos M. Roberts in 1849 and to Wm. H. McCrillis in 1851.
The title of those two gentlemen became and from that time has
been the merchantable title to this lot and practically the whole
town, and by many mesne conveyances, that title came one-half to
William C. Crosby in 1871, and as shown by the deed to him, he
paid therefor $19,000.   The other half came to T. N. Egery.
Under their respective wills, these defendants acquired their title
to the lot in question.   The defendants claim that plaintiff has not
title to any part of this lot.   The title which the nine Bartlett
heirs obtained under the Mass. deed, could only pass to Samuel by
having their deed operate the same as if their deed had been a
warranty.   *Bennett* v. *Davis*, 90 Maine, 457, and the conclusions of
the court are there stated as follows:   " Thus we find the law set-
tled in this state as to three classes of deeds (1) those of full
warrantee against all the world, (2) those with covenant of non-
claim, and (3) those which purport in terms to convey only the
grantor's existing right, title or interest.   Under deeds of the first
class, an after-acquired title inures to the grantee.   Under deeds of
the second and third classes an after acquired-title does not pass to
the grantee."   Samuel Bartlett under the deed to him from the nine
heirs may have been entitled to a deed to himself of the whole lot.
What he may have been entitled to, and what he really obtained,
are two different things.   He really, under that deed, obtained title
to one-tenth in common and undivided of that lot and every other
heir obtained a tenth.   Their previous deed, as we have shown,
did not convey to him those nine-tenths and nothing else having
been done, no deed from them to him since having been executed,
the title to those nine-tenths must still be in them or their heirs.
Who those heirs may be, nothing in the case shows.   It is admitted
that every lot in this town with the exception of five public lots

and lots 37, 49, 61 and 86 and the north part of lot 12 and of lot 24 were subject to taxation by the State of Maine in 1840, and thereafter, because before 1840 Mass. had conveyed all except those lots. R. S., 1841, c. 14, §§ 1-10. Up to August 10, 1848, there was no provision for the sale of lands thus forfeited, nor any provision for the sale of land for state taxes. By the assessment of a tax, the due publication of notice thereon and the failure for four years next following the act of assessment to pay the tax, the title of the land so taxed became wholly forfeited and the title thereof vested in the state free and quit from all claims of any former owner, and the same was held and owned by the state by a title which was declared by statute to be " perfect and indefeasible." The tax of 1844 on this town or any portion of it was not paid. Next in order was an act which went into effect August 10, 1848, (and the court will here take notice that this was after the lots as specified above had become the property of the State by a title perfect and indefeasible) namely, chapter 65 of the Acts of 1848. Pursuant to that Act, the Land Agent conveyed to Amos M. Roberts by deed dated April 30, 1849, all the right, title and interest which the State had by virtue of forfeiture in and to 17,798 acres of land in township 2 R. 7. Next in order is the Act of 1852, c. 272. " Purchasers of lands sold for alleged forfeiture to the state, for non-payment of taxes, shall have no claim against the state for any defect of title to lands hereafter sold, or under any pretext whatever; but the deed which have or may be given by the land agent shall vest in the grantee all the interest of the state in the lands therein described and no more; notwithstanding any irregularities in the notices, or failure to comply with the provisions of the acts under which said sales were made." The State, by the Act of 1852, admitted that the purchaser from it acquired its title, and the Act of 1852 cured all defects in the proceedings under the Act of 1848. *Hodgdon* v. *Wight*, 32 Maine, 326, affirmed in *Adams* v. *Larrabee*, 46 Maine, 516. This latter case was a writ of entry, and the defendant Larrabee claimed through just such a tax deed. In the opinion, the court say, " if the tax was legally assessed, the whole tract became forfeited, and the state acquired a

title thereto perfect and indefeasible. If that was so, whether the sale to the tenant was valid or invalid, the demandant cannot recover." Then the court considered the question, whether the assessment was valid, and they decide that the assessment was not valid, owing to a misdescription. Then follows this language : "If the assessment had been upon the whole township in solido designating the number and range, it would have been good. In such case, each owner could have computed the amount due from him for his part." After the decision in *Hodgdon* v. *Wight* and the decision in *Adams* v. *Larrabee*, if a client had asked his attorney whether or not, under the circumstances of this present case, the original owners of the lots in T. 2 range 7 on which the taxes had not been paid, had lost their title as between them and the state, we confidently assert that any lawyer would have been warranted in advising his client that the original owners and their grantees had lost title and that the title was either in the state or the grantee of the state. It is a strange thing that the Maine case of *Hodgdon* v. *Wight* is nowhere referred to in the United States case of *Hodgdon* v. *Burleigh*. So far as influencing the decision of Judge Fox, it seems that the case of *Hodgdon* v. *Wight* might as well have never been decided. He utterly ignores it. Although it was an opinion by the Supreme Court of Maine drawn by ETHER SHEPLEY, he does not even give it the cold respect of a passing glance.

It was the duty of the United States court to have followed the decision of the Maine court right or wrong, and had the Maine decision been followed, the decision in *Hodgdon* v. *Burleigh* in the United States court would have been exactly opposite to what it was. The Supreme Court of the United States follows the construction of the state by the highest court of the state which is the rule of property in that state. *Bacon* v. *Northwestern Mutual Life Ins. Co.*, 131 U. S. 258; *Kaukauna Water Power Co.* v. *Green Bay & M. Canal Co.*, 142 U. S. 254; and follows the decision of the highest court of the state in regard to the title to real estate, and the construction of deeds and statutes in respect thereto. *Halstead* v. *Buster*, 140 U. S. 273; *Hanrick* v. *Patrick*, 119 U. S. 156; *Ridings* v. *Johnson*, 128 U. S. 212; *Clement* v. *Packer*, 125

U. S. 309; *Gormley* v. *Clark*, 134 U. S. 338; *Morley* v. *Lake Shore and M. S. R. Co.*, 146 U. S. 162; *Duncan* v. *McCall*, 139 U. S. 449; *Bardon* v. *Land & R. Improvement Co.*, 157 U. S. 327; *1st Nat'l Bank* v. *Chehalis County*, 166 U. S. 440; *Fallbrook Irrigating Co.* v. *Bradley*, 164 U. S. 112. But the question here goes deeper than that. The Supreme Court had rendered a decission in 1853, which settled property rights,—rights as to the title to real estate,—a decision from which there was no appeal. That decision settled beyond question, that by the operation of the laws which we have been considering, the original owners lost their title. The decision has stood unquestioned by any court in Maine from that time to this. It had been approved in *Adams* v. *Larrabee*. The original owners of the lots have never questioned it. They acquiesced in it. Their silence for this long term of years proves it. They abandoned the lands. They have never paid a tax on them, they have never, from that day till within a very few years, exercised an act of ownership over them. Take this lot 29, the one in suit here. The record does not show a single year's taxes paid by Baker since 1840. The first and only thing which the record shows the owners of the original title to have done since 1840 is the giving of the right, title and interest deed by Elizabeth O. Baker for the consideration of one dollar in 1898. The case of *Hodgdon* v. *Burleigh* was decided by Judge Fox in 1880, but nine years before that William C. Crosby and Mr. Egery had bought this town. They bought not a tax title. They bought a title which the Supreme Court of this state had twice declared the state had owned by a perfect title, and which that court had said the state had conveyed, and by many and innumerable conveyances that title came to the grantors of Mr. Crosby and Mr. Egery. Mr. Crosby, as the court knows, was a prominent member of this bar, engaged in the active practice of the law, a man conversant with the decisions of the court. He relied on those decisions. He showed and proved that he relied upon them by paying $19,000 for his half of this town. He did not buy a tax title. He bought a title which had the best foundation in the world, a deliberate decision of the Supreme Court of this state. Under these circum-

stances, a decision of Judge Fox rendered nine years after Mr. Crosby had parted with his money, rendered under the circumstances which we have stated, rendered contrary to law, should and can have no weight whatever. The decision in *Hodgdon* v. *Burleigh* should have followed the Maine decision whether that decision was right or wrong. If that decision can have any weight under these circumstances the right of property, about which we delight to boast, is a myth. The court in *Clarke* v. *Strickland* did not pass upon the question whether the tax was legally assessed or not, but we say a fair construction of the language of the opinion is proof that Judge Ware must have had in mind his duty to follow the Maine opinion, but strange to say, he did not follow the case of *Hodgdon* v. *Wight*, the Maine case. Clarke claimed that by the passage of the Act of 1848, the forfeiture which had already taken place and which had placed the title to the land absolutely in the state, was fully opened or waived. Strickland cited *Hodgdon* v. *Wight*, to meet that contention and claimed that that case absolutely held that the forfeiture was not opened or waived. The court said that it did not so understand the opinion in *Hodgdon* v. *Wight*, then follows this language, and this ipse dixit settled that case: "The Act appears to me to be a complete waiver of all prior forfeitures." If then, *Hodgdon* v. *Wight* does hold that the Act of 1848 is not a full waiver, Judge Ware admits, in this very opinion, that he should have followed that decision, and he then should have held that the Act of 1848 did not waive the forfeiture.

Contrast the two cases of *Hodgdon* v. *Wight*, where SHEPLEY, C. J., drew the opinion, TENNEY, HOWARD, RICE and APPLETON concurring, and *Adams* v. *Larrabee*, where TENNEY, C. J., drew the opinion, APPLETON, CUTTING, MAY and KENT concurring, with the two cases of *Clarke* v. *Strickland*, and *Hodgdon* v. *Burleigh*. We simply say that we believe the weight of legal knowledge and legal ability is in favor of the Maine court in at least the same proportion as they exceed in numbers, eight to two. But we strenuously contend that the decision in *Hodgdon* v. *Wight* was right. Both cases, *Hodgdon* v. *Wight* and *Hodgdon* v. *Burleigh*, hold that at the expiration of the four years, after the taxes of

1841, 1842, 1843 and 1844 as the case may be, were assessed, the land on which the taxes were not paid became the property of the state by a perfect title.  The state having a perfect title could do with the land as it saw fit.  Grant it for charitable or educational purposes, sell it in any manner it saw fit, and apply the proceeds as it saw fit.  A perfect title carries with it those rights.  One cannot exist without the other.  The perfect title cannot exist without the right.  Those rights are a part of, they make up, a perfect title.  The Act of 1848 was a matter of grace to the former owners of the land.  The state received no consideration for the passage of that Act.  It was not compelled to pass it.  It was like a grant made to any private person, or corporation.  That Act did not take away any rights which anybody had.  It did not curtail any privilege which any former owner had.  It did profess to give those former owners new privileges.  Whatever new privileges were bestowed upon those former owners, was a matter of gift to them.  That statute then, we submit, must have a strict construction.  *Dubuque & Pacific R. R. Co.* v. *Litchfield*, 23 How. 88.  These defendants who deraign title under the state are entitled to the same construction of that statute.  One of these three conditions is true of that statute.  Either, first, it shows a plain and manifest intention on the part of the legislature to completely open and waive the forfeiture ; or, second, it just as plainly shows that such was not the intention ; or, third, the intention in that respect is doubtful.

If the intention to open the forfeiture in the manner claimed by the United States cases is plain and palpable, then the members of the Maine court which decided *Hodgdon* v. *Wight* were surely blind. Remembering that the opinion was drawn by SHEPLEY, C. J., and concurred in by the members of the Supreme Judicial Court, we must be forced to the conclusion that at least the intention to open the forfeiture was not plain.  Had it been plain they would have seen it.  If the intention not to open the forfeiture is plain, or if the intention was doubtful, then the decision of the Maine court was right.  Again, it was the contemporaneous exposition of that statute.  We submit that its decision was correct, and founded upon

plain legal principles. *Staats* v. *Board*, 10 Gratt. 405; *Wild* v. *Seerpell*, 10 Gratt. 405; *Hale* v. *Branscum*, 10 Gratt. 418; *Usher* v. *Pride*, 15 Gratt. 190; *Smith* v. *Thorp*, 17 W. Va. 221.

This court should fully uphold the decision in the Maine cases, *Hodgdon* v. *Wight* and *Adams* v. *Larrabee*, under the doctrine of stare decisis. Am. & Eng. Ency. of Law and authorities there cited under Stare Decisis. *Evansville* v. *Senhenn*, 41 L. R. A. 726; *Rockhill* v. *Nelson*, 24 Ind. 424; *Poulson* v. *Portland*, 1 L. R. A. 673; *Strowbridge* v. *Portland*, 8 Ore. 67. "But if the rule, says WELLS, J., in *Pike* v. *Galvin*, 30 Maine, 539, laid down in *Fairbanks* v. *Williamson*, were clearly incorrect, in my judgment it would be unwise to change it without the action of the legislature. It has now remained for nineteen years, many decisions have been made in conformity to it, and many titles have been acquired under it. The overruling it will not only be introducing a new rule, in relation to future conveyancing, but produce a retrospective action, upon deeds already made. A judicial decision by the power of construction, looks to the past as well as to the future, and embraces all cases that are in existence, or that may arise hereafter. The stability of legal decisions affords a security which ought not to be impaired, unless upon the most pressing necessity." When, therefore, a decision is a rule of property it should not be overruled, unless there be absolute necessity for it. A decision is a rule of property when it settles legal principles, governing the devolution and ownership of property. *Louisville, &c. R. Co.* v. *Davidson County Ct.* 1 Sneed, (Tenn.) 695; *Lucas* v. *Tippecanoe County*, 44 Ind. 541; *Houston* v. *Williams*, 13 Cal. 27. A decision of a court is its judgment, the opinion is the reasons given for that judgment. Freeman Judg. 2nd Ed. § 2. What then was the judgment, the decision in *Hodgdon* v. *Wight*, having in mind the doctrine of stare decisis? A decision must necessarily include the judgment of the court, and everything which must necessarily exist, in order that such a judgment may be rendered. In *Hodgdon* v. *Wight*, the judgment of the court was that partition be granted as prayed for. In order to grant partition, the court must have found that Hodgdon had title. In

order to find that Hodgdon had title, the court must have found that by the assessment and non-payment of the state tax of 1842, and by force of the Act of 1848, and by the deed after the forfeiture from the land agent, and by the passage of the Act of 1852, and by the conveyance from the grantee of the State to Hodgdon, Hodgdon had title. It must have settled the question that the passage of the Act of 1848, did not open the previous forfeiture to the state unless the former owners took advantage of its provisions. It must have settled the question that if all the provisions of the Act of 1848 were not complied with, all such deficiencies were healed by the Act of 1852. If they had decided any one of these questions the other way, they could not have reached the conclusion which they did, and ordered partition. That judgment, that decision we confidently submit settled the principles governing the devolution and ownership of property held by a title the same as Hodgdon's title. Our title in this case is exactly the same as Hodgdon's. Therefore we say, under the doctrine of stare decisis, which, so far as this case is concerned, is clean cut and clear,—that decision should not be overruled. The only effect which the overruling of *Hodgdon* v. *Wight* and *Adams* v. *Larrabee* can have will be retroactive, and that will be to demolish the foundations upon which titles to much property has stood for quite half a century. Titles, too, to land bought and paid for at its market value in reliance upon the law as laid down in those cases. Confusion will be sure to follow and litigation will be rife. To overrule those decisions can produce no good to the law. The sure and inevitable result will be harm and perhaps ruin to innocent parties who put their reliance upon the Supreme Court of Maine. The stability of titles, everybody must admit, is of the utmost importance. If this court overrules the decisions in *Hodgdon* v. *White* and *Adams* v. *Larrabee* now, what assurance can anybody have that some time in the future, the then court may not overrule the decision which this court may render, and reestablish *Hodgdon* v. *Wight*? Where, then, are the people to look for stability in the titles to their property, if the courts fail them? *Douglass* v. *Pike County*, 11 Otto, 677. The State of Maine

made a contract with its grantee Amos M. Roberts. The Maine court decided that under that contract, under the deed, Mr. Roberts obtained the title to the land. Upon the strength of that exposition of the law, these defendants bought the land. Although a contract has been fully performed, there still remains an obligation to that executed contract, protected by the contract clause of the constitution. Ency. of Law, 2nd Ed. p. 1033, and cases cited.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, FOGLER, PEABODY, JJ.

EMERY, J. The published opinion in *Millett* v. *Mullen,* ante, p. 400, governs this case to the extent of determining that the defendants have no title, and that the plaintiff's predecessors in title, notwithstanding their delinquency in not paying state taxes, have had revived in them by the state an heritable and conveyable title good against strangers to the state's title. The only remaining question is what of that original title the plaintiffs deraign from those predecessors. The demanded land is Lot No. twenty-nine in Township Two, Range Seven, W. E. L. S.

The plaintiff deraigns title from Jonathan Bartlett a revolutionary soldier and a beneficiary under sundry resolves of Massachusetts granting lands to revolutionary soldiers. The other heirs of Jonathan Bartlett for a consideration released and quitclaimed their interest in such land as such heirs and of their brother, Samuel Bartlett, April 10th 1828. The title to Samuel Bartlett has admittedly come to the plaintiff. Nearly two years afterward, on February 10, 1830, the Land Agent of Massachusetts, acting under the above named Resolves, executed a deed of Lot twenty-nine to "the heirs and assigns of Jonathan Bartlett," which deed appears to have come to the possession of Samuel Bartlett. The defendants now contend that the quitclaim deed to Samuel Bartlett from the other heirs of Jonathan Bartlett did not pass the title afterward conveyed to them as heirs of Jonathan Bartlett by the subsequent deed of 1830, and hence that at the most the plaintiff shows title to only Samuel Bartlett's share as such heir in one-tenth.

We do not think this contention can be sustained. The deed of February 10, 1830, is not the origin nor foundation of the Bartlett title. By its own terms it suggests a prior title. The granting clause is "give, grant, convey and confirm." The prior legislative resolves are referred to as the authority for executing the deed. The Jonathan Bartlett whose "heirs and assigns" are eo nomine grantees, is described as a revolutionary soldier within the purview of the resolves. The deed does not fairly purport to be itself a grant of the land, but rather evidence of such a grant, an identification or confirmation of a title, rather than a creation of a title.

Referring to the Resolves themselves, the language of the first Resolve, that of March 5, 1801, is, "Resolved: that there be, and hereby is granted to each non-commissioned officer and soldier, etc., two hundred acres of land, etc." And again in the same Resolve, it was "further Resolved: that where any such non-commissioned officer or soldier has deceased or shall decease before he shall get possession of the land *hereby granted* to him, his children or widow aforesaid shall be entitled to the same." The Resolve of June 19, 1801, provided for surveying the necessary lands into two-hundred acre lots, and that the lots thus surveyed should "be assigned to the several persons claiming and being entitled to the same as aforesaid." By the Resolves of February 19, 1813, and June 17, 1820, further time and further facilities were granted for proving the claims of persons claiming under the former Resolves. The Resolve of March 4, 1828, was in the words following:

"Resolved: That there be, and hereby is granted to each non-commissioned officer and soldier, who enlisted into the American Army to serve during the revolutionary war with Great Britain, and who were returned as a part of this state's quota of said army, and who did actually serve in said army the full term of three years, and who was honorably discharged, and to their heirs and assigns, two hundred acres of land to be held in fee simple from the date hereof, those who have heretofore drawn lots to retain the lots they have severally drawn, and those who have not yet drawn lots, are hereby permitted to draw the same from the undrawn lots remaining in said Mars Hill township any time within five

years from the date hereof, any provisions or conditions in the former resolves on this subject to the contrary notwithstanding."

It is not questioned that Jonathan Bartlett was a revolutionary soldier and shown to be completely within the provisions of the foregoing resolves;—nor is it questioned that Massachusetts owned the land granted.

The deed of the other heirs of Jonathan Bartlett to Samuel Bartlett was given after the Resolve of March 4, 1828, had gone into effect. We think it evident from the language of the Resolves that the heirs of Jonathan Bartlett then had (Jonathan Bartlett having deceased) a vested grant, or title, or interest which they could convey or assign. The particular lot of two hundred acres which might be assigned to them was perhaps not then designated, or ascertained, but the right, the title, was already created and granted to them by the Resolves. The designation of the lot would inure to whomsoever they should assign or convey their title.

In *Leavenworth, &c. R. R. Co.* v. *The United States*, 92 U. S. 733, an Act of Congress had declared, "That there be, and is hereby granted to the State of Kansas for the purpose of aiding in the construction [of two proposed railroads with branches of which the general route was described] every alternate section of land, designated by odd numbers for ten sections in width on each side of said road and each of its branches." Of course, where the granted sections would finally be located could not be ascertained until the lands were surveyed and the railroads and branches were located. The court said: "There be and is hereby granted," are words of absolute donation and import a grant in praesenti. . . They vest a present title in the State of Kansas, though a survey of the lands and a location of the roads are necessary to give precision to it, and attach it to any particular tract. The grant then becomes certain, and by relation has the same effect upon the selected parcels as if it had specifically described them." In *Schulenberg* v. *Harriman*, 21 Wall. 44, it was held that a similar act in favor of Wisconsin passed a present interest in the lands though the sections were to be afterward located. In *Mayo* v.

*Libby*, 12 Mass. 339, the language of the Resolve of June 19, 1795 was: "Resolved that there be and is hereby released to each of the inhabitants of the town [of Hampden] who settled   .   .   . one hundred acres of land to be held in severalty and to be laid out, etc." The committee for the sale of Eastern lands afterward in 1805, the 100 acres having been then run out, gave a deed of the same in the name of the Commonwealth. It was held that the grant was by the Resolve and not by the deed. In *Sargent* v. *Simpson*, 8 Maine, 148, by a Resolve of Massachusetts a certain quantity of land in Sullivan was ",confirmed and granted" to each of the persons named in a report of a commissioner, and the selectmen were authorized and directed to give deed accordingly. It was held that the title was created by the resolve and not by the deed, and where the original beneficiary had disposed of his title by will, a subsequent deed from the selectmen to his "heirs" by that designation gave them no title as against the prior grantee of the beneficiary.

It is to be further noted that the deed in the case at bar was made "unto the heirs and assigns of Jonathan Bartlett." The insertion of the word "assigns" indicates that the purpose of the deed was to confirm a prior title to whomsoever the owners of that title might have assigned it.

It was not decided in *Chandler* v. *Wilson*, 76 Maine, 77, that the Resolve of 1828 did not make a grant in praesenti. The question there was not whether the Resolve vested a fee, but in whom the fee vested, whether in the soldier himself only, or in his assignee by lawful conveyance. The soldier had assigned his right and title and the Land Agent thereupon made the deed to the assignee. The grant, however, had been made by the Resolve, and the deed was merely confirmatory of the previous grant, by indicating its proper recipient.

In any view of the case we think the whole title, whether under the Resolves alone, or under them and the deed combined, vested in Samuel Bartlett. That his title has come to the plaintiff is not questioned.

According to the terms of the report the mandate must be,

<div align="right">

*Judgment for the plaintiff.*

*Damages assessed at one dollar.*